UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                               :

VISTA OUTDOOR INC.                 :

              Plaintiff,          :

                               :   No. _____

      -against-               :

REEVES FAMILY TRUST, MICHELLE    :   **COMPLAINT**
WILKENS, JEREMY WILKENS, and KYLE   :
REEVES,                         :

               Defendant.     :

-----------------------------------------------------------x

Plaintiff Vista Outdoor Inc. ("Plaintiff," "Vista," "Vista Outdoor" or the "Company"), by its attorneys, Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), for its Complaint for declaratory and other relief against defendants Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkins ("Sellers") and Kyle Reeves (together with Sellers, "Defendants"), upon knowledge as to itself and its conduct and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE CASE

1.    This Complaint arises out of Defendants' refusal to abide by the contract that made them very wealthy. Plaintiff Vista Outdoor acquired Jimmy Styks LLC ("Jimmy Styks"), a startup company making stand-up paddle boards, on July 20, 2015, for an up-front payment to the Sellers of $40 million.

2.    The acquisition afforded the founders of Jimmy Styks the opportunity to accelerate their company's growth out of its initial start-up phase by leveraging the expertise and resources of a large, professionally run, public outdoor products company. Vista Outdoor, which

operates a portfolio of fifty leading outdoor recreation brands, has expertise and market presence that a start-up like Jimmy Styks could never match.

3.      The growth opportunity that the acquisition afforded to Jimmy Styx and its founders was recognized in the acquisition purchase agreement between Vista and the Defendants (the "Purchase Agreement"). The Purchase Agreement provides Defendants with an earn-out opportunity to receive additional purchase consideration totaling up to another $40 million if they successfully work with Vista Outdoor to grow the Jimmy Styks business following the acquisition. Under the Purchase Agreement, the $40 million total earn-out opportunity would be paid out in three tranches of up to $10 million, $15 million and $15 million, respectively, if Jimmy Styks meets certain gross profit levels in the first, second, and third year following the acquisition.

4.      Recognizing that the continued involvement of the Jimmy Styks co-founders, Kyle Reeves and Jeremy Wilkens (together, "the co-founders"), would be key to the success of Jimmy Styks under Vista Outdoor management, the co-founders were each retained and given management authority over the Jimmy Styks business within Vista Outdoor following the acquisition. In these management roles, it was expected that Mr. Reeves and Mr. Wilkens would help Vista Outdoor grow the Jimmy Styks business and integrate it into Vista Outdoor's family of brands. Such growth was in everyone's interests—the Sellers could receive up to $40 million in additional consideration, and Vista would experience growth and returns on its significant investment in Jimmy Styks.

5.      This deal should have been the proverbial win-win. Alas, for reasons best known to Defendants, the co-founders squandered the opportunities presented by Vista's acquisition of Jimmy Styks at seemingly every turn.

6.      Through late 2015 and early 2016, the co-founders refused to integrate the Jimmy Styks business into Vista Outdoor and resisted Vista's attempts to bring the Jimmy Styks division into the streamlined management processes that are the hallmark of Vista Outdoor and a source of its success.  For instance, the co-founders refused to migrate Jimmy Styks' operations to Vista's enterprise resource planning and customer ordering software systems and repeatedly resisted Vista's efforts to make Jimmy Styks' product distribution more efficient by shipping products through Vista's central distribution network.

7.      In another effort to undercut the benefits of the acquisition, the co-founders took steps to hurt relationships between the Jimmy Styks business and its customers.  For instance, the co-founders simply ignored repeated customer requests to perform routine factory audits.  And the co-founders even sent profanity ridden emails personally attacking a buyer at one of Jimmy Styks' two largest customers, copying senior managers at that customer.  The co-founders also undermined efforts to sell Jimmy Styks products to a significant potential new customer—an online retailer—by arbitrarily setting minimum order limits so high that that retailer chose not to order any product from Jimmy Styks.

8.      Vista, recognizing that the co-founders were being uncooperative, could have taken immediate measures to seek their ouster.  Rather, in an effort to save the relationship and generate sales and profits, which would help both Vista and the co-founders, the Company hired two additional senior executives to work with the co-founders to facilitate integration of Jimmy Styks into Vista and to grow the business.  Yet, even this effort was rebuffed.  For example, the co-founders refused to even meet for some six weeks with one of these executives.

9.      Mr. Reeves and Mr. Wilkens also repeatedly refused offers from Vista management to help resolve issues and agree on a workable plan to integrate and grow the

Jimmy Styks business.  When pointedly and repeatedly asked by Vista management to provide a list of five things Vista could do to help Jimmy Styks, the co-founders refused to engage.  For weeks they would not provide such a list.  When they finally relented, they provided a list with 25 items and then refused to meet or cooperate in prioritizing the list and finding the best solutions to address the items and the list.

10.     Alas, the co-founders' disregard for their obligations was not limited to intransigence, counterproductive efforts, and uncooperative behavior.

11.     In early 2016, Vista learned that, in the year prior to the acquisition, Defendants had pushed  sales to Jimmy Styks' second largest customer that later proved to be too much inventory for that customer to hold.  Because the customer was still holding excess inventory at the end of the peak summer selling season in 2015, it had less need to make additional purchases from Jimmy Styks for the 2016 season.   Consequently, in February 2016, the customer decreased its annual purchase projections by over 30%.

12.     In addition, Defendants placed significant pre-orders of Jimmy Styks stand-up paddle boards from Jimmy Styks' suppliers in reliance on initial annual purchase projections from this customer, who Defendants knew was already holding substantial inventory from the prior season. As a result of this reckless purchase, Vista was left with significant excess inventory when that customer decreased its projections as described above.

13.     Following this reduction, Defendants understood they had virtually no means of meeting the 2016 gross profit targets set forth in the Purchase Agreement through legitimate sales.  As a result, they knew as early as February, 2016 that they would not receive any of the up to $10 million in contingent consideration potentially available to them following the first year of the three-year earn-out period.

14.     In a misguided attempt to secure this additional $10 million payment, Defendants launched a scheme to artificially inflate Jimmy Styks' sales and gross profit by personally purchasing one million Jimmy Styks decals.

15.     At significant cost to Vista Outdoor, Mr. Reeves and Mr. Wilkens procured approximately 1.25 million Jimmy Styks decals and placed those decals in inventory at Jimmy Styks' Huntington Beach, California corporate office, bypassing Vista's established purchasing and inventory management procedures and exceeding their purchasing authority under Vista Outdoor's policies.  In order to conceal their scheme, Mr. Reeves engaged a third-party sourcing agent in China to identify a new supplier not previously used by Jimmy Styks or Vista Outdoor to create the decals.  Defendants then had the sourcing agent place a verbal order for the product, travel to the supplier, and spend several days overseeing the expedited production of the stickers.

16.     Mr. Reeves and Mr. Wilkens then made the Jimmy Styks decals available for purchase on the Jimmy Styks web site at an arbitrarily chosen price of $4 and $5 per decal, a remarkably high price for an item that is usually handed out for free as promotional material.

17.     On June 22, 2016, seven business days prior to the end of the 2016 earn-out period set forth in the Purchase Agreement, Mr. Reeves and Mr. Wilkens attempted to place orders to purchase approximately 900,000 Jimmy Styks decals at $4 or $5 per sticker.  As Mr. Reeves and Mr. Wilkens conceded to a senior Vista executive when the sham decal sales scheme was uncovered and halted, Mr. Reeves and Mr. Wilkens were willing to pay $4 million to buy the decals because they believed that the purchase would entitle them to receive the full $10 million earn-out opportunity set forth in the Purchase Agreement for the first year following the acquisition.  The co-founders also admitted that they had been considering a scheme of this type since shortly after the signing of the Purchase Agreement in July 2015.

18.     The sticker purchase was part of a brazen but ill-conceived scheme by Mr. Reeves and Mr. Wilkens to capture the 2016 earn-out opportunity despite their having failed to grow the Jimmy Styks business through legitimate means during the first year following the acquisition. The co-founders, having received monthly financial reports on Jimmy Styks' sales and gross profit, knew that Jimmy Styks' business would end the first year following the acquisition more than $3 million short of the gross profit level required for them to be entitled to the full $10 million earn-out payment.  They concealed their order of 1.25 million Jimmy Styks decals by working through a sourcing agent in China with whom they had a pre-existing relationship and ordering from a manufacturer in China with whom Vista had not previously worked.  They delayed Vista's discovery of the scheme by ordering the decals directly and bypassing Vista's normal purchasing process, then having the stickers shipped to their satellite office rather than to Vista's central shipping/receiving hub.  In purchasing the decals for a total cost (billed to Vista) of almost $100,000, Mr. Reeves and Mr. Wilkens also willfully violated Vista Outdoor's previously established signing authority policy, which capped their authority to bind Vista at $35,000.  Each of these steps was designed to conceal their actions until they were prepared to place their sham order and make their claim on the $10 million earn-out payment.

19.     When the scheme was uncovered and the attempted decal purchase halted by Vista, Mr. Reeves and Mr. Wilkens asserted that their attempted purchase of approximately 900,000 Jimmy Styks decals, a product never before sold by Jimmy Styks, was a legitimate transaction.  The co-founders ignored the reality that they were attempting to execute on an illegitimate transaction that would have artificially inflated gross profit at Jimmy Styks and Vista Outdoor by approximately $3.9 million.  As a publicly-traded company with extensive fiduciary

and disclosure obligations to its investors, Vista Outdoor simply could not allow that sham transaction to go forward.

20.     The sticker scheme was the last straw for Vista Outdoor.  Upon learning of the scheme, Plaintiff terminated Mr. Wilkins' employment and Mr. Reeves' consulting agreement on June 23, 2016.

21.     While the final gross profit calculation for the Jimmy Styks business in the first earn-out period will not be issued for several weeks, there can be no doubt that a live dispute exists between Vista and the Defendants.  The Defendants have taken the position that Vista was wrong to stop the sticker scheme and, had the scheme been allowed to play out, the sticker sales should have counted towards Jimmy Styks' earn-out targets.  Vista, of course, believes that any revenue that might have been generated by the sticker scam should not count towards Jimmy Styks' gross profit for purposes of the earn-out calculations.  Vista seeks a declaration to this effect.

22.     Moreover, Vista seeks monetary damages for the cost of the stickers—which the co-founders charged to Vista outside their express authority and for any fee owed to the sourcing agent—who was improperly directed by the co-founders.  Vista was further harmed by its counterparties' violation of the terms and spirit of the Purchase Agreement, which clearly reflect the intent of the parties that the earn-out consideration provided for therein be paid in the event of real growth in the Jimmy Styks stand-up paddle board business rather than following sham transactions with insiders for large quantities of a non-core product.  Finally, in yet another breach of Sellers' contractual obligations to Vista, they have damaged Vista by refusing to pay it the full amount of the working capital adjustment owed under the plain terms of the Purchase Agreement.  Accordingly, Plaintiff seeks both monetary and declaratory relief—namely, a

declaration from this Court that Defendants' attempted sticker purchase scheme was not a permissible means of generating gross profit at Jimmy Styks for purposes of satisfying the earn-out provision of the Purchase Agreement, and an award of Plaintiff's damages that were caused by Defendants' wrongful scheme and other actions in violation of the Purchase Agreement.

23.    This Court can and should declare as much and award Plaintiff monetary damages in an amount to be determined at trial, but in any case no less than $1,000,000.

## PARTIES

24.    Plaintiff Vista Outdoor Inc. is a Delaware corporation with its principal place of business in Farmington, Utah.  Vista Outdoor is a leading global designer, manufacturer, and marketer of consumer products in the growing outdoor sports and recreation markets.  Vista is a public company, whose share trades on the New York Stock Exchange under the ticker "VSTO."  Vista is a signatory to the Purchase Agreement.

25.    Defendant Reeves Family Trust is a Canadian irrevocable trust.   Upon information and belief, the Reeves Family Trust is an asset-holding entity associated with, and controlled by, Kyle Reeves.  Mr. Reeves is a co-founder of Jimmy Styks LLC.  The Reeves Family Trust is a signatory to the Purchase Agreement.  Prior to the execution of the Purchase Agreement, the Reeves Family Trust owned 500 of the 1000 membership units of Jimmy Styks LLC.

26.    Defendant Michelle Wilkens is a California resident and a United States citizen.  Upon information and belief, Michelle Wilkens is the wife of Jeremy Wilkins.  Michelle Wilkens is a signatory to the Purchase Agreement.  Prior to the execution of the Purchase Agreement, Michelle Wilkens owned 490 of the 1000 membership units of Jimmy Styks LLC.

27.     Defendant Jeremy Wilkins is a California resident and United States citizen. Jeremy Wilkins is a co-founder of Jimmy Styks LLC.  Upon information and belief, Jeremy Wilkens is the husband of Michelle Wilkins.  Jeremy Wilkens is a signatory to the Purchase Agreement.  Prior to the execution of the Purchase Agreement, Jeremy Wilkens owned 10 of the 1000 membership units of Jimmy Styks LLC.

28.     Defendant Kyle Reeves is a California resident and a Canadian citizen.  Kyle Reeves is a co-founder of Jimmy Styks LLC.  He is not a signatory to the Purchase Agreement.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this proceeding.  Pursuant to Section 10.11 of the Purchase Agreement, Defendants have expressly consented to the jurisdiction of this Court for the purposes of "[a]ny action or proceeding arising out of or relating to this Agreement."

30.     Venue is proper in this Court, because Defendants agreed in Section 10.11 of the Purchase Agreement "to the exclusive jurisdiction of any New York state court in New York County, or Federal Court of the United States of America, sitting within New York County in the State of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to th[e Purchase Agreement]."  The parties further agreed "not to commence any such action or proceeding except in such courts."

## FACTUAL ALLEGATIONS

**A.      Vista's Acquisition Of Jimmy Styks From Defendants**

31.     Vista is the current owner of Jimmy Styks.  The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens are the former owners, now the Sellers.

32.     Vista acquired its ownership interest Jimmy Styks from the Sellers via a multi-million dollar membership interest purchase transaction.

33.     That transaction was memorialized in the Purchase Agreement, dated July 20, 2015, and the transaction closed on July 20, 2015 (the "Closing Date").  *See* PA (Attached as Exhibit A to the Declaration of Jonathan D. Fortney, dated July 19, 2016).

34.     In 2015, Vista became interested in acquiring Jimmy Styks as a means of expanding its outdoor business to include stand-up paddle boards and entering the watersports segment.  Although it was an alluring acquisition opportunity, Vista did have certain strategic business concerns about the structure of Jimmy Styks.

35.     Specifically, at the time Vista was contemplating the acquisition, Jimmy Styks had very few employees, limited infrastructure, and an extremely concentrated customer base.

36.     Jimmy Styks' two key employees were its co-founders, Kyle Reeves and Jeremy Wilkens.

37.     Jimmy Styks' sales were almost wholly reliant on two key customers, and the co-founders made clear to Vista that the relationships with these two customers were tied firmly to the co-founders.  The co-founders stressed to Vista that those customer relationships would falter in their absence.

38.     In order to account for these business realities, Vista structured its acquisition to include an upfront cash payment to the co-founders, as well as certain contingent payments the co-founders could earn over a three-year period based on growth in Jimmy Styks' gross profit over that period.

39.     Vista and the Sellers agreed that such an earn-out structure would mutually align the parties' respective interests and provide a valuable incentive tool for shared success in making Jimmy Styks profitable going forward.

40.     The earn-out targets were not constructed haphazardly.  Instead, they were based on the projected sales and gross profit figures that the co-founders provided to Vista as part of their efforts to sell Jimmy Styks.  Importantly, the sales and gross profit projections for the Jimmy Styks business, on which the earn-out targets were based, were developed entirely by the Sellers and did not assume the beneficial impact of any sales or cost synergies that would result from Jimmy Styks being incorporated into the Vista family of brands.

41.     Ultimately, Vista agreed to acquire Jimmy Styks from the Sellers for a purchase price of (i) $40,000,000 in cash paid on the Closing Date and (ii) further "Contingent Consideration" payable only in the event certain incremental profitability growth milestones are achieved by Jimmy Styks in each of the year-long periods ending July 2016, July 2017, and July 2018.  *See* PA §§ 2.6.

42.     As is relevant to this dispute, the Purchase Agreement, in Section 2.6(a), addressed the circumstances under which the Sellers would be entitled to an earn out payment for the period ending July 3, 2016:

> Section 2.6 <u>Contingent Consideration</u>. As promptly as practicable but in no event later than thirty (30) days following the completion by Purchaser's independent auditors of their review of Purchaser's consolidated quarterly financial statements for the fiscal quarters ending July 3, 2016, July 2, 2017 and July 1, 2018, Purchaser shall prepare and deliver to Seller a written statement (each, a "Gross Profit Statement") setting forth in reasonable detail its calculation of the Gross Profit of the Acquired Business for the respective periods described below, including a detailed calculation of the items included in the Cost of Goods Sold, and shall make the following payments, if applicable:
>
> (a) With respect to the 2016 Earn-Out Period,
>
> (i) Seller will not be entitled to receive any payment if the 2016 Gross Profit is less than the 2016 Gross Profit Threshold;
>
> (ii) if the 2016 Gross Profit is equal to the 2016 Gross Profit Threshold, then Seller shall be entitled to receive an amount equal to $1,000,000;

(iii) if the 2016 Gross Profit is greater than the 2016 Gross Profit Threshold but less than the 2016 Gross Profit Target (the amount by which the 2016 Gross Profit is greater than the 2016 Gross Profit Threshold being the "*2016 Threshold Excess Amount*"), then Seller shall be entitled to receive an amount equal (A) $1,000,000 *plus* (B) the 2016 Threshold Excess Amount *multiplied by* a fraction, the numerator of which is $9,000,000 and the denominator of which is an amount equal to the 2016 Gross Profit Target *minus* the 2016 Gross Profit to Section 2.6(a)(ii) above; and

(iv) if the 2016 Gross Profit is equal to or greater than the 2016 Gross Profit Target, then Seller shall be entitled to receive an amount equal to $10,000,000 in lieu of the amount that would have otherwise been payable pursuant to either Section 2.6(a)(ii) or Section 2.6(a)(iii) above.

*See* PA § 2.6(a).

43.    The Purchase Agreement, in Section 1.1, also provided "Certain Definitions," including definitions for the following terms relevant to the 2016 earn-out calculation:

"*2016 Earn-Out Period*" means the period beginning on July 1, 2015 and ending on July 3, 2016.

"*2016 Gross Profit*" means the amount of Gross Profit of the Acquired Business for the 2016 Earn-Out Period.

"*2016 Gross Profit Target*" means $12,434,605.

"*2016 Gross Profit Threshold*" means $9,947,684.

*See* PA § 1.1.

44.    In addition, Section 2.6(d) of the Purchase Agreement addressed the mechanism for handling any earn-out calculations and potential payments:

(d) Through the end of the 2018 Earn-Out Period and until all amounts payable to Seller pursuant to this Section 2.6 have been paid in full, the following shall apply:

(i) The Company shall provide to Seller, no later than the 15th day following the end of each accounting month, a balance sheet as of the last day of such accounting month and profit and loss statement for such accounting month, along with a written statement setting forth in reasonable detail (including supporting calculations) its estimate of the Gross Profit and Cost of Goods Sold for such accounting month.

(ii) The Company and/or Purchaser shall consult with Seller in advance of determining Gross Profit for 2016, 2017 and 2018, and will reasonably take into consideration Seller's input with respect to how Gross Profit should be calculated;

(iii) If Seller disputes, in good faith, the calculations included in a Gross Profit Statement, Seller shall notify Purchaser in writing within fifteen (15) days of Seller's receipt of a Gross Profit Statement of such objection (a "*Gross Profit Objection*"). If Seller fails to notify Purchaser of a dispute within such fifteen (15) day period, or if Seller notifies Purchaser in writing prior to the expiration of such fifteen (15) day period that it has no objections, the Gross Profit Statement shall be "finally determined" for purposes hereof, including Section 2.7 below. If, however, Seller delivers a timely Gross Profit Objection pursuant to the terms of this Section 2.6(d), Seller and Purchaser shall negotiate in good faith for a period of thirty (30) days following Purchaser's receipt of the applicable Gross Profit Objection in an effort to resolve any such disputes. If Purchaser and Seller cannot resolve such disputes within such thirty (30) day period, each party shall have all rights and remedies available to such party under applicable Law.

*See* PA § 2.6(d).

45.     The earn-out arrangement furthered the parties' alignment of interests in successfully and sustainably growing Jimmy Styks, which would benefit Vista as the new owner and the Defendants as the beneficiaries of the contingent payments.

**D.     Vista's Post-Acquisition Relationship With Defendants**

46.     As part of the Jimmy Styks acquisition, Vista agreed to retain Kyle Reeves as a consultant and Jeremy Wilkens as a senior employee to continue to run Jimmy Styks.  Mr. Wilkens was hired for a management position at the Company and given the title Director of R&D.  Mr. Reeves was hired as a consultant in order to assist him in obtaining a United States work visa as a Canadian citizen.

47.     Through late 2015 and early 2016, the co-founders, despite having great incentives to grow the Jimmy Styks business, put up repeated obstacles to Vista's many good faith attempts to integrate and grow the Jimmy Styks business.

48.     For example, one of Vista's first initiatives was to integrate Jimmy Styks into the Vista business enterprise resource planning and other software systems, thereby achieving

efficiencies in customer ordering, supply chain management, inventory planning and other areas. Prior to the acquisition, the co-founders managed all purchases, manufacturing orders, and sales via excel spreadsheets on a laptop. But the co-founders resisted such efforts, bristling in profanity-strewn communications that such integration would somehow ruin the inefficient manual process they had in place prior to the acquisition.

49.     Vista came to learn that such abusive and unprofessional communications were part and parcel of how the co-founders conducted business. The co-founders response to any perceived inconvenience or change in the way they operated Jimmy Styks was to lash out at Vista. For example, when a freight company was late to pick up stock from Jimmy Styks' storage in California, Jeremy Wilkens lashed out at Vista, stating: "Let me start by saying I am venting to you because you are the last point of contact. This is not personal, but what the **_FUCK_** just happened with your shipping company????? . . . . As you can imagine I told the driver to "FUCK OFF" Call dispatch, and tell them to FUCK off too!!!!" *See* Ex. B (Email from J. Wilkens).

50.     The co-founders would routinely berate both Vista employees and Jimmy Styks customers through similar abusive, profanity-strewn communications. For example, after a Jimmy Styks delivery was held up by an invoice issue, Kyle lashed out at his Vista contact, stating: "I guess this just a big F#$% you to both Jeremy and I, hey?? After 10 months of this, now [the customer is] Stuck at the boarder needing the invoice you send them the same Bullshit Invoice with every brand listed except Jimmy Styks. Not to mention [the customer] is Jimmy Styks largest retailer and is the Vendor NOT BUSHNELL !!!!!! There's absolutely no hope for your Company!!! Just wish it wasn't a bunch of lies and broken promises! What a pathetic useless bullshit company!" *See* Ex. C (Email from K. Reeves). They also refused to accept, let

alone incorporate, any Vista input and insight into how to integrate Jimmy Styks operations into Vista and thereby enhance Jimmy Styks' performance.

51.     Despite this behavior, which might have led another company to oust the co-founders, Vista went the extra mile throughout late 2015 and early 2016 to help Jimmy Styks grow.  For example, Vista pointedly and repeatedly asked the co-founders to provide a list of five things Vista could do to help Jimmy Styks.  But the co-founders refused to engage.  After refusing for months to provide such a list, they finally relented, providing Vista with a list of 25 items.  However, the co-founders promptly refused to meet or cooperate in Vista's efforts to set priorities and find solutions to address the issues that the co-founders had identified.

52.     Nevertheless, Vista took the initiative to immediately satisfy at least some of the co-founders' requests.  Indeed, Vista searched for, interviewed, and hired three full-time employees and allocated one existing employee to focus exclusively on water sports growth. Each of these individuals had significant and well-established track records in the outdoor recreation and consumer products industries and could have brought significant customer relationships and operational know-how to Jimmy Styks.  But the co-founders puzzlingly refused to meet with one of them for over six weeks and eventually cut off communications with most of these individuals—each of whom had been hired at significant expense by Vista to help the Jimmy Styks business succeed.

53.     The co-founders also sabotaged significant existing and prospective Jimmy Styks customer relationships.  For example, after receiving revised forecasts from Jimmy Styks' second-largest customer, the co-founders sent their contact at that customer a profanity ridden email attacking their contact and the customer as incompetent.  They even chose to include their contact's two supervisors on that unprofessional and offensive email.  The co-founders also

ignored a significant customer's repeated factory audit requests, which resulted in escalation of the issue at the customer and injury to the relationship.

54.     Not content with fracturing existing client relationships, the co-founders also obstructed efforts to build relationships with significant potential new Jimmy Styks customers. The co-founders falsely informed one massive online retailer contemplating purchases of Jimmy Styks products that a minimum purchase was required—it was not—and then proceeded to set the minimum number at such a high mark that that the potential customer balked.  Further, for another significant outdoor retailer, Vista succeeded in securing orders and placing Jimmy Styks products in the retailer's printed catalog.  Inexplicably, the co-founders failed to place any orders to manufacture the advertised stand-up paddle boards, thereby undermining efforts to increase Jimmy Styks' sales to that customer and potentially damaging a customer relationship that accounts for over $100 million of annual sales by Vista's other brands.

55.     The co-founders' also pushed sales to Jimmy Styks' second largest customer in 2015 that proved too aggressive and resulted in reduced demand from that customer. Specifically, in February 2016, as a result of excess inventory created by Defendants' aggressive sales the prior year, Jimmy Styks' second-largest customer was forced to decrease its projected purchases by approximately 30%.

56.     The customer explained that the key driver of this reduction was the fact that it had far more Jimmy Styks products from the 2015 season than it was able to sell to consumers.

57.     As a direct result of this excessive stock on hand, the customer did not have the need to purchase the quantity of stand-up paddle boards and related accessories for the 2016 season that had been assumed in the projections provided to Vista prior to the acquisition.

Significantly, these enhanced numbers had formed the basis for the earn-out gross profit targets reflected in the Purchase Agreement.

58.     With this critical downgrade by Jimmy Styks' second-largest customer, Defendants understood that Jimmy Styks could not achieve the 2016 Gross Profit Threshold of approximately $9.9 million and would fall well short of the 2016 Gross Profit Target of approximately $12.4 million.

59.     Defendants were able to predict Jimmy Styks' gross profit for the first earn-out period with fair accuracy long before the final results would be known.  Defendants were provided with monthly statements of Jimmy Styks' gross profit by the Plaintiff and were able to use those statements and their knowledge of customer order flow to make projections of Jimmy Styks' gross profit for the first earn-out period.  Second, Defendants were able to reference and rely on historical, season-driven sales as reasonable predictors of future sales.[1]

60.     After receiving the key customer downgrade, rather than work with Plaintiff to generate additional legitimate sales to other outside customers, Defendants launched their scheme to artificially and improperly inflate Jimmy Styks' 2016 Gross Profit figures.

**D.     The Sticker Scam**

61.     Defendants conspired together to secretly manufacture a vast number of Jimmy Styks stickers outside of Vista's normal purchasing procedures and supply chain, ship those stickers directly to Jimmy Styks' headquarters in California, post the stickers to the website at a massive mark-up, and then personally purchase the majority of the stickers.

---

[1]     This is especially true in the season-driven paddleboard market in which wholesalers concentrate purchases in the first quarter of each year in order to be in a position to sell products to consumers during the peak paddle boarding season that runs largely from Memorial Day to Labor Day each year.

62.     Defendants' intent was to use this sticker scheme to generate artificial profits and capture the maximum earn-out for the 2016 Earn-Out Period.

63.     At some point in the first quarter of 2016, Defendants initiated their scheme, settling on stickers as the go-to product.   Choosing stickers yielded several benefits to Defendants:   stickers cost relatively little to manufacture, in small quantities are unlikely to arouse suspicion, and can be unilaterally marked-up to create the large margins needed to generate the significant artificial profits that the Defendants were hoping to create.

64.      Accordingly, Defendants designed four Jimmy Styks stickers (depicted below) and quietly set about securing vast quantities of those stickers.



65.     To obtain the stickers, Defendants deliberately chose not to use any existing Jimmy Styks manufacturers, but instead contacted the Jimmy Styks' third-party sourcing agent in China with whom they had a relationship that predated the Vista acquisition.   Defendants deliberately avoided making contact with the sourcing agent through the normal Vista purchasing channels, which would have involved Vista Outdoor's Hong Kong-based employees.

66.     Defendants unilaterally instructed that sourcing agent to locate a manufacturer in China with whom Jimmy Styks had no previous relationship.   Defendants were careful to structure the communications with the sourcing agent in such a way as to avoid detection by

anyone at Vista.  Defendants also directed the sourcing agent to enter a verbal contract for the manufacturing of the stickers so as to avoid detection.

67.     At no point was Vista consulted about manufacturing or selling Jimmy Styks stickers and Vista did not approve such a project prior to the stickers being ordered and placed for sale on the Jimmy Styks web site.  Defendants skirted Vista's authority and procedures and unilaterally ordered the stickers.  Of note, in purchasing the decals for a total cost (billed to Vista) of almost $100,000, Mr. Reeves and Mr. Wilkens also willfully violated Vista Outdoor's previously established signing authority policy, which capped their authority to bind Vista at $35,000.

68.     Defendants then directed the sourcing agent to travel to the manufacturer, spend several days at the manufacturer, and oversee directly the expedited production of the stickers, which the agent did.

69.     What turned out to be a first tranche of stickers were printed and then shipped to Jimmy Styks.  Rather than ship the stickers through the normal Vista channels and have them delivered to Vista's central shipping hub in Kansas, where other Jimmy Styks inventory is held, Defendants had the stickers shipped directly to their office in California.

70.     In March 2016, a first shipment of approximately 250,000 stickers was delivered to the Jimmy Styks office in Huntington Beach, California.

71.     Defendants subsequently posted the stickers for sale on the Jimmy Styks website at a significant mark-up over the costs of producing the stickers.

72.     Plaintiff has since discovered that, after Defendants launched the stickers on the website, Kyle Reeves, Jeremy Wilkens, and Michelle Wilkens each placed an order for one

sticker of each and paid for the stickers via PayPal.  This was the culmination of Defendants' dry run of the sticker scheme.  Defendants then proceeded to scale-up their scheme.

73.     On June 22, 2016, Plaintiff learned from two different sources of a second order by Defendants for production of approximately 1 million additional stickers.

74.     One of Plaintiff's employees in Hong Kong first received notice that Defendants had purchased in May 2016 (an additional) 1 million stickers.  The employee notified Vista's Director of Watersports, who immediately instructed the employee to cancel the purchase.

75.     But when the employee attempted to cancel the order, Plaintiff learned that the stickers had already been sent by Federal Express to Huntington Beach in early June.

76.     Upon further investigation, Plaintiff learned that no purchase order had ever been issued for any Jimmy Styks stickers, as required by Vista's purchasing policies and procedures. Instead, Defendants simply had their sourcing agent locate a random manufacturer and place the order verbally.

77.     On the afternoon of June 22, 2016, after Defendants' scheme came to light, they claimed that the scheme was legitimate and demanded that Vista fill Defendants' orders to personally purchase over 900,000 stickers.   Specifically, Defendants submitted six purchase orders, three from The Reeves Family Trust and three from Jeremy Wilkens, for just over $4 million worth of stickers.

78.     In fact, based on the Mr. Reeves' and Mr. Wilkens' statements to a senior Vista executive on the day that their scheme came to light, it appears that they may have begun planning the sticker scheme shortly after completing the sale of Jimmy Styks to Vista.  Such premeditated and calculated plans to circumvent plain contractual and fiduciary obligations to Plaintiff further evidence the willful and wanton nature of Defendants' wrongdoing.

79.     Defendants' clandestine sticker scheme was illegitimate, conducted in bad faith, and worked a significant harm on Vista Outdoor.

80.     Specifically, Defendants' purchase and acceptance into inventory of 1.25 million Jimmy Styks stickers was accomplished without any purchase orders or bona fide demand from unaffiliated Jimmy Styks customers.  This production of a purported product and unilateral creation of a massive store of useless inventory violated Vista's well-established purchasing policies and standards.

81.     A verbal order placed surreptitiously through a third-part sourcing agent in China for over 1.25 million stickers violates Company policy.  Given the careful steps taken to hide the sticker scheme, Defendants no doubt sought to avoid detection of their scheme.

82.     Further, in purchasing the decals for a total cost (billed to Vista) of almost $100,000, Mr. Reeves and Mr. Wilkens also willfully violated Vista Outdoor's previously established signing authority policy, which capped their authority to bind Vista at $35,000.

83.     In addition to violating Company policies and guidelines, the sticker scheme also violated specific instructions from Vista to Mr. Reeves and Mr. Wilkens that they were not permitted to engage manufacturers to purchase products absent an initiating purchase order.

84.     Defendants' sticker scheme had no economic justification.  Jimmy Styks is generally viewed as an entry-level, value priced stand-up paddle board brand.  Brands positioned at the "value" price point do not typically have any significant demand from customers to purchase branded stickers and decals—much less demand for 1 million such stickers at a $4 or $5 per-sticker price. To illustrate, during the approximately two-month period the stickers were available for sale on the website, only seven were sold in the normal course to unaffiliated purchasers.  Even at a generous rate of 10 sticker sales per month, it would take over 8,000 years

to sell 1 million stickers.  The scale of the co-founders' sticker purchase alone is so stunning as to provide conclusive evidence of its illegitimacy.

85.     Further, the attempted sticker transaction would have represented a significant transaction between Vista Outdoor and affiliated insiders that would have required explanatory disclosure to avoid misleading Vista Outdoor's investors as to the real growth of the Jimmy Styks business.  Indeed, the $4 million transaction contemplated by Defendants would have accounted for almost one-third of Jimmy Styks' total gross profit for the period from July 2015 through July 2016.

86.     The sticker scheme lacked real economic substance and was the product of bad faith.  Plaintiff, upon learning of Defendants' scheme, had no choice but to cancel Defendants' orders and terminate for cause both Kyle Reeves as a consultant and Jeremy Wilkins as a manager.

87.     As a direct and proximate result of Defendants' bad faith execution of the sticker scheme, Plaintiff has been damaged by its counterparties to the Purchase Agreement, who have proven that they will resort to bad faith and improper means to bilk Plaintiff (and its public stockholders) out of millions of dollars to which Defendants are not entitled.  Accordingly, Plaintiff has taken the position that the sticker scheme did not satisfy the earn-out provisions of Section 2.6 of the Purchase Agreement, and seeks a declaration from this Court that Defendants' sticker scheme was not a permissible means of generating gross profit at Jimmy Styks for purposes of satisfying the earn-out provisions of Section 2.6 of the Purchase Agreement.

88.     Further, as an additional direct and proximate result of Defendants' sticker scheme and mismanagement, Plaintiff has suffered significant monetary damages, including no less than $100,000 in expenses associated with the manufacture of the stickers, as well as the

deprivation of the use of that capital and the employee time and effort spent uncovering and unwinding the scheme.

89.     Defendants are liable to Plaintiff for its monetary damages, and this Court can and should award Plaintiff damages in an amount to be determined at trial.

90.     In addition, the Purchase Agreement also mandated in Section 10.1 that, in the event a dispute arises related to the Purchase Agreement, the prevailing party in any such action "shall recover all of such party's costs and reasonable attorneys' fees."  *See* PA § 10.1.  Section 10.1 of provided in full that:

> Section 10.1 Costs and Attorneys' Fees. In the event that any Action is instituted concerning or arising out of this Agreement, the prevailing party shall recover all of such party's costs and reasonable attorneys' fees incurred in connection with each and every such action, suit or other proceeding, including any and all appeals and petitions therefrom.

*See* PA § 10.1.

## CLAIMS FOR RELIEF

### COUNT I
### (Declaratory Relief)

91.     Plaintiff incorporates by reference the allegations of paragraph 1 through 90 as part of this Count.

92.     Vista brings this claim for declaratory relief against the Sellers—The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens.

93.     Vista entered into a valid, binding, and enforceable agreement with the Sellers concerning a membership interest purchase transaction, the Purchase Agreement, dated July 20, 2105, for which Vista received ownership of all of Jimmy Styks in exchange for significant consideration.

94.     Vista has performed and continues to perform all material conditions, covenants, and promises related to the Purchase Agreement as required on Vista's part under the Purchase Agreement's terms and conditions, including the payment of $40 million to Sellers upon closing.

95.     Section 2.6 of the Purchase Agreement contained certain earn-out provisions entitled "Contingent Consideration."  *See* PA § 2.6.

96.     Specifically, Section 2.6 provided for additional, but contingent, payments to the Sellers only in the event that Jimmy Styks met and/or exceeded the Gross Profit forecasts that the Sellers provided to Vista during the negotiations that led to the Purchase Agreement.

97.     However, rather than work with Plaintiff to generate legitimate, arms-length sales resulting in lawful gross profit, Defendants resorted to bad faith efforts to secretly produce stickers as part of a scheme, which they then attempted to purchase in an inappropriate attempt to create gross profit where none existed.

98.     Given that Defendants' orders for the sham product were illegitimate, insider transactions and the product of bad faith, Plaintiff had no choice but to refuse Defendants' sticker orders.  Vista now seeks an order from this Court declaring that Defendants' scheme should not be considered a permissible means of generating gross profit at Jimmy Styks and should not be considered for purposes of determining whether Sellers satisfied the earn-out provision Section 2.6 of the Purchase Agreement.

99.     Because there is a live dispute concerning Defendants' sticker scheme and its impact on the calculation of gross profits of Jimmy Styks for 2016, and because Defendants' bad faith and wrongful scheme violates the terms and spirit of Section 2.6, this Court can and should declare that Defendants' scheme was not a permissible means of generating gross profit at

Jimmy Styks for purposes of satisfying the earn-out provision of Section 2.6 of the Purchase Agreement.

## COUNT II
### (Breach of Contract)

100.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 99 as part of this Count.

101.    Vista brings this claim for breach of contract against the Sellers—The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens.

102.    Vista entered into a valid, binding, and enforceable agreement with the Sellers concerning a membership interest purchase transaction, the Purchase Agreement, dated July 20, 2105, for which Vista received ownership of all of Jimmy Styks in exchange for significant consideration.

103.    Vista has performed and continues to perform all material conditions, covenants, and promises related to the Purchase Agreement as required on Vista's part under the Purchase Agreement's terms and conditions, including the payment of $40 million to Sellers upon closing.

104.    Section 2.6 of the Purchase Agreement contained certain earn-out provisions entitled "Contingent Consideration."  *See* PA § 2.6.

105.    Specifically, Section 2.6 provided for additional, but contingent, payments to the Sellers only in the event that Jimmy Styks met and/or exceeded the Gross Profit forecasts that the Sellers provided to Vista during the negotiations that led to the Purchase Agreement.

106.    However, rather than work with Plaintiff to generate legitimate, arms-length sales resulting in lawful gross profit, Defendants resorted to bad faith efforts to secretly produce stickers as part of a scheme, which they then attempted to purchase in an inappropriate attempt to create gross profit where none existed.

107.    Given that Defendants' orders for the sham product were illegitimate, insider transactions and the product of bad faith, Plaintiff had no choice but to refuse Defendants' sticker orders.  Plaintiff now seeks to recover the damages it suffered as a result of Defendants' scheme and breaches of the Purchase Agreement.

108.    As a result of Defendants' intentional misconduct and breach of the Purchase Agreement, Defendants directly and proximately harmed Vista.

109.    Defendants are liable to Vista for:  (i) actual and consequential damages in an amount to be determined at trial; and (ii) costs and attorney's fees.

### COUNT III
### (Declaratory Relief)

110.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 109 as part of this Count.

111.    Plaintiff brings this claim for declaratory relief against the Sellers—The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens.

112.    As is true with all contracts, the Purchase Agreement includes an implied covenant that the parties will exercise their obligations under the contract in good faith, deal fairly with the other parties to the contract, and refrain from actions that would deprive the contracting parties of the benefits of their bargain.

113.    As described above, Defendants have acted in bad faith, have dealt unfairly with Plaintiff Vista and have attempted to deprive Plaintiff of its reasonable expectations under the Purchasing Agreement.

114.    Among other things, Defendants have erected road blocks at every turn to stymie Plaintiff's growth of the Jimmy Styks' business, including resisting any meaningful integration into Vista, mistreating Vista employees, harming customer relationships, violating established

Vista policies and authority limits, and focusing not on growing the Jimmy Styks business as contemplated by the Purchase Agreement but launching the sticker scheme to improperly inflate gross profit.

115.   Further, Defendants concocted a bad faith scheme to avoid their contractual obligations to Plaintiff while nevertheless securing the performance-based benefit of that contract for themselves.

116.   Defendants' sticker scheme—an effort to improperly inflate the financial performance of Jimmy Styks—is a bad faith attempt to pervert the "Gross Profit" terms of the Purchase Agreement in a way that neither the parties nor any commercially reasonable person would have contemplated at the time of contracting.

117.   Defendants' actions have undermined key customer relationships, wasted Company capital, and impeded the Company's ability to pursue and achieve its primary business objectives for Jimmy Styks contemplated in the Purchase Agreement—namely the continued and sustained growth and development of Jimmy Styks through real sales of real products.

118.   Given that Defendants' orders for the sham product were illegitimate, insider transactions and the product of bad faith, Plaintiff had no choice but to refuse Defendants' sticker orders.  Vista now seeks an order from this Court declaring that Defendants' scheme was the product of bad faith and thus should not be considered a permissible means of generating gross profit at Jimmy Styks and should not be considered for purposes of determining whether Sellers satisfied the earn-out provision of the Purchase Agreement.

119.   Because there is a live dispute concerning whether Defendants' actions and wrongful sticker scheme constituted bad faith, and because Defendants' actions and scheme constituted bad faith, this Court can and should declare that Defendants' actions and sticker

scheme were in bad faith and thus not a permissible means of generating gross profit at Jimmy Styks for purposes of satisfying the earn-out provision of the Purchase Agreement.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

120.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 119 as part of this Count.

121.    Plaintiff brings this claim for breach of the implied covenant of good faith and fair dealing against the Sellers—The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens.

122.    As is true with all contracts, the Purchase Agreement includes an implied covenant that the parties will exercise their obligations under the contract in good faith, deal fairly with the other parties to the contract, and refrain from actions that would deprive the contracting parties of the benefits of their bargain.

123.    As described above, Defendants have acted in bad faith, have dealt unfairly with Plaintiff Vista and have attempted to deprive Plaintiff of its reasonable expectations under the Purchasing Agreement.

124.    Among other things, Defendants have erected road blocks at every turn to stymie Plaintiff's growth of the Jimmy Styks' business, including resisting any meaningful integration into Vista, mistreating Vista employees, harming customer relationships, violating established Vista policies and authority limits, and focusing not on growing the Jimmy Styks business as contemplated by the Purchase Agreement but launching the sticker scheme to improperly inflate gross profit.

125.    Further, Defendants concocted a bad faith scheme to avoid their contractual obligations to Plaintiff while nevertheless securing the performance-based benefit of that contract for themselves.

126.    Defendants' sticker scheme—an effort to improperly inflate the financial performance of Jimmy Styks—is a bad faith attempt to pervert the "Gross Profit" terms of the Purchase Agreement in a way that neither the parties nor any commercially reasonable person would have contemplated at the time of contracting, and which breached the implied covenant of good faith and fair dealing.

127.    Defendants' actions have undermined key customer relationships, wasted Company capital, and impeded the Company's ability to pursue and achieve its primary business objectives for Jimmy Styks contemplated in the Purchase Agreement—namely the continued and sustained growth and development of Jimmy Styks through real sales of real products.

128.    As a result of Defendants' intentional misconduct and breach of the implied covenant of good faith and fair dealing inherent in the Purchase Agreement, Defendants directly and proximately harmed Vista.

129.     Defendants are liable to Vista for:  (i) actual and consequential damages in an amount to be determined at trial; and (ii) costs and attorney's fees.

<u>**COUNT V**</u>
**(Tortious Interference With Contract)**

130.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 129 as part of this Count.

131.    Vista entered into a valid, binding, and enforceable agreement with the Sellers concerning a membership interest purchase transaction, the Purchase Agreement, dated July 20, 2105, for which Vista received ownership of all of Jimmy Styks in exchange for significant consideration.

132.    As a co-founder of Jimmy Styks and a Vista consultant tasked with significant responsibility for operating Jimmy Styks, Defendant Kyle Reeves had full and complete

knowledge of Plaintiff's Purchase Agreement with the Sellers.  Further, Mr. Reeves repeatedly confirmed in email communications with Vista employees that he was concerned about Jimmy Styks meeting the earn-out provisions in the Purchase Agreement and described such "Contingent Consideration" as "my money."

133.    Despite Mr. Reeves' knowledge of the Purchase Agreement and its terms, he intentionally procured a breach of the Purchase Agreement by Defendants Jeremy Wilkens and the Reeves Family Trust via related-party transactions with the Company to artificially and illegally inflate Jimmy Styks' financial performance.

134.    Specifically, Mr. Reeves conspired with Defendants Jeremy Wilkens and the Reeves Family Trust to surreptitiously source a new manufacturer to create and ship to Jimmy Styks approximately 1,250,000 Jimmy Styks decals.

135.    Mr. Reeves had no justification for procuring such a breach.

136.    Further, Mr. Reeves procured the breach through improper means, acting maliciously, fraudulently, and illegally.

137.    Specifically, the stickers Mr. Reeves caused Jimmy Styks to acquire were secured without any purchase orders or bona fide purchasers.  Moreover, Reeves knew that the purchases of approximately 900,000 stickers by related parties for non-commercial reasons violated Vista company policy and also raised problematic accounting issues had the Defendants' purchase of stickers been allowed to close.  Further, the sticker acquisitions violated Mr. Reeves' representations to Vista that he would not engage manufacturers to purchase products absent an accompanying purchase order.  Finally, the sticker acquisitions also violated express limits on Mr. Reeves' and Mr. Wilkens' signing authority.

138.    As a result of Mr. Reeves' tortious interference as alleged above, namely his intentional solicitation of Mr. Wilkens' and the Reeves Family Trust's breach of the Purchase Agreement by attempting to generate artificial, related-party sales in order to meet the 2016 Earn-Out provisions of the Purchase Agreement, Mr. Reeves directly and proximately harmed Vista.

139.    Mr. Reeves is liable to Vista for:  (i) actual and consequential damages in an amount to be determined at trial; and (ii) costs and attorney's fees.

**COUNT VI**
**(Breach of Contract)**

140.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 139 as part of this Count.

141.    Vista brings this claim for breach of contract against the Sellers—The Reeves Family Trust, Michelle Wilkens, and Jeremy Wilkens.

142.    Vista entered into a valid, binding, and enforceable agreement with the Sellers concerning a membership interest purchase transaction, the Purchase Agreement, dated July 20, 2105, for whole ownership of Jimmy Styks.

143.    Vista has performed and continues to perform all material conditions, covenants, and promises related to the Purchase Agreement as required on Vista's part under the Purchase Agreement's terms and conditions, including the payment of $40 million to Sellers.

144.    Section 2.5 of the Purchase Agreement provided for, following closing, the typical purchase price adjustments based on the estimated pre-closing balance sheet versus the actual balance sheet at closing.  *See* PA § 2.5.

145.    Specifically, Section 2.5(c) required Vista Outdoor to provide Sellers with a Closing Balance Sheet not more than 60 days after the Closing Date.  If Sellers did not object

within 30 days of receiving the Closing Balance Sheet, as permitted under Section 2.5(d), then Section 2.5(e) dictated that a post-closing adjustment to the purchase price be made "[p]romptly. Section 2.5(d) further dictated that, in the event the adjustment to the purchase price is "a negative amount, then Seller shall pay by wire transfer of immediately available funds to [Vista], an amount of additional cash equal to the entire amount of the shortfall, and such shortfall amount shall be deemed a decrease of the Purchase Price." *See* PA § 2.5(e)(v) (B).

146.    Vista provided Sellers with the Closing Balance Sheet on September 18, 2015. After receipt from Sellers via email of several questions relating to the Closing Balance Sheet, Vista provided clarification of certain items reflected on the Closing Balance Sheet, along with a slightly revised Closing Balance Sheet, on September 25, 2015.  Following receipt from Vista to answers to several additional follow-up questions regarding the revised Closing Balance Sheet, the Sellers did not object to the revised Closing Balance Sheet at any point within the 30-day window after receiving it.   The revised Closing Balance Sheet, when compared against the estimated pre-closing balance sheet evidenced a shortfall of  $132,284.

147.    Although the Sellers had the obligation to pay Vista the entirety of the $132,284 by wire of immediately available funds, Sellers to date have only paid Vista half of that amount via a payment of $66,142 from Jeremy and Michelle Reeves in October 2015.

148.    Accordingly, the Sellers have breached Section 2.5 of the Purchase Agreement by failing to pay Vista the totality of the Post-Closing Adjustment Payment rightfully due and owing to Vista.

149.    As a result of Defendants' breach of the Purchase Agreement, Defendants directly and proximately harmed Vista.

150.    Defendants are liable to Vista for:  (i) actual and consequential damages in an amount to be determined at trial, but in any event no less than $66,142; and (ii) costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vista respectfully demands the following relief:

(a)     On the First Claim for declaratory relief, a declaration by this Court that Defendants' scheme to generate artificial profits violated the language of, and intent of the parties to, the Purchase Agreement and in no way satisfied the earn-out provisions of Section 2.6;

(b)     On the Second Claim for breach of contract, compensatory and consequential in an amount to be determined at trial, but in any event no less than $1,000,000;

(c)     On the Third Claim for declaratory relief, a declaration by this Court that Defendants' scheme to generate artificial profits violated the duty of good faith and fair dealing implied in the Purchase Agreement and in no way satisfied the earn-out provisions of Section 2.6;

(d)     On the Fourth Claim for breach of implied covenant of good faith and fair dealing, compensatory and consequential in an amount to be determined at trial, but in any event no less than $1,000,000;

(e)     On the Fifth Claim for tortious interference with contract, forfeiture of all compensation received as a Vista consultant, and compensatory and consequential in an amount to be determined at trial, but in any event no less than $1,000,000;

(f)     On the Sixth Claim for breach of contract, compensatory and consequential in an amount to be determined at trial, but in any event no less than $66,142;

(g)     Prejudgment Interest;

(h)     The costs of bringing this action, including without limitation costs and reasonable attorneys' fees—as required by Section 10.1 of the Purchase Agreement; and

(i)      Such other relief in Plaintiff's favor as this Court deems just and proper.

Dated:  New York, New York
        July 19, 2016

                                        GIBSON, DUNN & CRUTCHER LLP

                                        By: _____
                                             Adam H. Offenhartz
                                             Jonathan D. Fortney

                                             200 Park Avenue, 47th Floor
                                             New York, New York 10166-0193
                                             Telephone:  (212) 351-3808
                                             Facsimile:  (212) 351-5272
                                             aoffenhartz@gibsondunn.com
                                             jfortney@gibsondunn.com

                                             *Attorneys for Vista Outdoor, Inc.*

34