UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
VISTA OUTDOOR INC.,                  :
                                     :          16 Civ. 5766
        Plaintiff,                   :
                                     :          OPINION AND ORDER
        -v-                          :
                                     :
REEVES FAMILY TRUST,
MICHELLE WILKENS,
JEREMY WILKENS,
AND KYLE REEVES,

        Defendants.
------------------------------------x

JED S. RAKOFF, U.S.D.J.

     Why would the executives (and former principals) of a

paddle-board division of a sports and recreation company cause

the company to make a one-time $60,500 purchase of one million

stickers that the executives themselves immediately attempted to

repurchase from the company for approximately $4 million? The

answer is that they thereby hoped to stick the company with a

$10 million "earnout" payment to the executives, thus netting

themselves a cool $6 million. Thanks, however, to the age-old

doctrine of good faith and fair dealing, and similar legal

protections, in the end it is these executives who are stuck.

     Before the Court are the motions and cross-motions for

summary judgment of plaintiff Vista Outdoor Inc. ("Vista") and

defendants Reeves Family Trust, Michelle Wilkens, Jeremy

Wilkens, and Kyle Reeves. The crux of the dispute is whether

1

defendants, two of whom were formerly employed by Vista,
improperly entered self-dealing transactions to hit profit
targets and thereby receive compensation known as an "earnout."
Vista blocked the transactions before they could be finalized.

For the reasons set forth below, the Court grants partial
summary judgment for Vista imposing a declaratory judgment that
the attempted transactions were not an appropriate means for
Jeremy Wilkens, Michelle Wilkens, and the Reeves Family Trust to
generate profits for the purposes of satisfying the earnout
(Count I), and holding further that defendants Jeremy Wilkens
and Michelle Wilkens breached the implied covenant of good faith
and fair dealing by attempting to enter such transactions (Count
IV), that Kyle Reeves tortuously interfered with the parties'
contract by intentionally procuring the breach by Michelle
Wilkens and Jeremy Wilkens (Count V), and that defendants Reeves
Family Trust, Michelle Wilkens, and Jeremy Wilkens are in breach
of Section 2.5 of the parties' Purchase Agreement (Count VI).
The Court also grants partial summary judgment for defendants
holding that the Reeves Family Trust did not breach the covenant
of good faith and fair dealing, and otherwise grants summary
judgment to both sides dismissing the remaining claims and
counterclaims.

Since, collectively, these rulings dispose of all of the claims, this Opinion and Order also directs the parties to submit proposed calculations of prejudgment interest so that final judgment may be promptly entered.

The basic facts are not in dispute. Plaintiff Vista is a public company specializing in outdoor sports and recreation products. Vista Outdoors's Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Pl.'s R. 56.1 Statement") at ¶¶ 1-3, ECF No. 73.[1] On July 20, 2015, Vista acquired Jimmy Styks, a manufacturer of stand-up paddle-boards ("SUPs"), cofounded by defendants Kyle Reeves and Jeremy Wilkens. Id. at ¶¶ 40-41. Since defendant Reeves was not personally an owner of Jimmy Styks, he did not sign the agreement memorializing the acquisition (the "Purchase Agreement"). Id. at ¶¶ 42-44, 47-49, 84. Instead, Vista signed the Purchase Agreement with defendants Jeremy Wilkens and Michelle Wilkens, husband and wife, and the Reeves Family Trust, a Canadian irrevocable trust whose sole trustee is defendant Reeves' mother. Id.[2]

---

[1] Unless otherwise indicated, citations refer to the corresponding paragraphs of both parties' Rule 56.1 statements.

[2] Defendant Reeves and his family are the sole beneficiaries of the trust. Id.

The Purchase Agreement contains what is known as an "earnout," which defendants concede was designed to allow Vista to "acquire Jimmy Styks by paying the full value of the company in two parts." See Wilkens Decl. at ¶ 11, ECF No. 64; see also Reeves Decl. at ¶ 2, ECF No. 61 ("An earn-out was a significant part of the consideration for the acquisition."). As the Second Circuit has explained, an "earnout permits parties to conclude a merger without first agreeing as to the proper valuation of the target company." Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 810 (2d Cir. 2014). Instead, "[t]hrough a contingent payment structure, the parties agree to disagree and defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved." Id.

Pursuant to this arrangement, Vista paid defendants $40 million at closing, and agreed to pay up to $40 million in additional, contingent consideration if Jimmy Styks met or exceeded targets during the three years after the acquisition. Pl.'s R. 56.1 Statement at ¶¶ 43-44, 47-49, 84. For "year one," defendants would receive a baseline $1 million payment if gross profits equaled $9,947,684, with the potential payout increasing as gross profits rose. Id. at ¶¶ 50-54. The year one earnout reached a maximum of $10 million if gross profits equaled or exceeded $12,434,605. Id. The Purchase Agreement further

4

specified that the parties will measure gross profits using
"generally accepted accounting principles . . . , as applied by
[Vista]." Fortney Decl. Ex. 3 at 5, 7.

Following acquisition, issues arose as Vista worked to
integrate Jimmy Styks into its business. Vista hired defendants
Reeves and Wilkens, Pl.'s R. 56.1 Statement at ¶¶ 114-117, but
in 2016, Jimmy Styks' two largest customers reduced their
anticipated orders. Id. at ¶¶ 154-167. Vista further admits that
it did a "poor" job integrating Jimmy Styks into its larger
corporate structure, id. at ¶¶ 140-147, but alleges (though it
is not undisputed) that defendants Reeves and Wilkens
exacerbated these problems by repeatedly taking combative
stances with Vista's management in profanity-laden emails. See
id. at ¶¶ 124, 150, 153, 349. Regardless, it is undisputed that
over the course of year one, it became clear that an earnout
payment based on anticipated orders was unlikely. Id. at ¶ 199.

Accordingly, defendants Reeves and Wilkens developed a plan
to "buy" the earnout. Id. at ¶¶ 152, 199, 268. Defendants first
considered purchasing a sufficient number of fins, screws, or t-
shirts from Jimmy Styks to trigger the payment. Id. at ¶¶ 197-
198, 200. They ultimately settled on stickers because they
yielded the best profit margin. Id. at ¶¶ 201-203, 226. In April
2016, defendant Reeves placed an order on behalf of (and

billable to) Vista for one million stickers, to be rush
delivered to Jimmy Styks' California office rather than Vista's
distribution center near Kansas City (which was the primary
distribution center for Jimmy Styks SUPs). Id. at ¶¶ 205-213,
222-223. Upon learning that the stickers were ready, Reeves then
emailed Wilkens stating: "Haha, this is real dude! 60k worth of
stickers!!! We are going to go down in the history books . . ."
Id. at ¶ 221.[3] Defendant Wilkens later testified that he was
"sure" purchasing the stickers "would have raised flags" within
Vista, and had hoped that "organic sales" would be sufficient to
obtain the earnout payment. Id. at ¶¶ 269-270.

To the extent that Jimmy Styks had previously distributed
stickers to its customers, it had provided them gratis. Id. at
¶¶ 227-230. Nonetheless, on June 22, 2016, seven business days
prior to the end of the 2016 earnout period, defendants
attempted to purchase from Jimmy Styks approximately 900,000
stickers at $3.99 or $4.99 per sticker for a total price of just
under $4 million. Id. at ¶¶ 244, 251. Specifically, defendant
Reeves submitted three purchase orders on behalf of the Reeves
Family Trust, even though he was not the trustee and had no

---

[3] Defendant Wilkens responded, "How much for the beer fridge? Is
this all of them?" See Fortney Decl. Ex. 85, ECF. No. 37.

authorization, id. at ¶¶ 251-256, and defendant Jeremy Wilkens

submitted three purchase orders on his own behalf, id. at ¶ 251.

Vista, however, blocked the transaction, fired Reeves and

Wilkens, and filed a six-count complaint alleging, inter alia,

that defendants' attempted sticker purchase breached the implied

covenant of good faith and faith dealing (Count IV), and that

defendant Reeves tortuously interfered with the Purchase

Agreement by causing the other defendants' breach (Count V). Id.

at ¶¶ 253, 354-355, 362. Defendants answered with six

counterclaims, including that Vista blocked the transaction in

bad faith (Counterclaim III) and fired defendants in violation

of state and federal whistleblower laws (Counterclaims IV-VI).

Id. at ¶ 363. Vista subsequently withdrew Counts II and III of

its complaint. See ECF No. 80. Vista now moves the Court to

grant summary judgment in its favor on Counts I, IV, V, and VI

and to dismiss defendants' counterclaims in their entirety.

Defendants cross-move for summary judgment in their favor on

Counterclaim III and to dismiss Vista's claims in their

entirety.

The Court begins with whether Vista is entitled to a

declaratory judgment that the sticker transactions were not an

appropriate means to generate gross profits for the purposes of

the earnout because defendants Michelle Wilkens, Jeremy Wilkens,

and the Reeves Family Trust attempted to enter the transactions in breach of the implied covenant of good faith and fair dealing (Counts I and IV, respectively). Under New York law, "implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included." N.Y. Univ. v. Continental Ins. Co., 662 N.E.2d 763, 769 (N.Y. 1995) (citations omitted). Pursuant to this principle, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Sec. Plans, 769 F.3d at 817.

There is no genuine dispute that the sticker purchase would have defeated the purpose of the earnout. Defendants admit that the earnout is not incentive compensation linked to one year's profits. Instead, it reflects Jimmy Styks' "full value" at the time of the acquisition. See Wilkens Decl. at ¶ 11; Reeves Decl. at ¶ 2. If Jimmy Styks hit certain targets during the three years after the acquisition, Vista agreed to pay up to $40 million on the assumption that the company was more valuable than the parties anticipated. See Sec. Plans, 769 F.3d at 810.

Reasonable parties would understand that this arrangement makes economic sense only if Jimmy Styks generates its sales in the ordinary course of its business. As noted, for year one,

8

Vista agreed to pay defendants $1 million if gross profits reached $9,947,684 and an additional $3.62 in compensation for every $1 in gross profits thereafter (up to a maximum earnout of $10 million). While Vista would technically "lose" $2.62 for every $1 in gross profit over the threshold, Vista in reality would suffer no detriment because the value of Jimmy Styks as a company would increase simultaneously. Pl.'s R. 56.1 Statement at ¶¶ 104-106. This is because past profits, when generated in a predictable way, are likely to be repeated as future profits. Id. By artificially increasing Jimmy Styks profit during a critical period following the acquisition, defendants overstated the "full value" of the company and caused Vista to overpay to the tune of $10 million.[4]

The terms of the Purchase Agreement support this understanding. Section 3.7(c) includes a representation by defendants that Jimmy Styks' "accounts receivable . . . have

---

[4] Defense counsel's admissions during oral argument on the motions and cross-motions for summary judgment further support the Court's holding. During the colloquy, the Court posed the hypothetical of whether defendants would have acted in bad faith had they instead sold one sticker for $4 million. Defense counsel answered that Vista "would have had a problem." See Transcript dated January 19, 2017 at 17, 42. There is no material difference between selling one sticker for $4 million and 600,000 stickers for $4 million. Both transactions theoretically qualify as revenue under GAAP, yet both are one-time, wholly artificial, insider transactions made outside the ordinary course of business and with no possibility of being repeated.

arisen from bona fide transactions entered . . . in the ordinary course of business consistent with past practice (emphasis added)." Accordingly, if defendants had made their $4 million sticker purchase prior to the acquisition, these profits would not have counted toward Jimmy Styks' overall valuation. No reasonable party would believe that such purchases would count after the acquisition, given that they are no more reflective Jimmy Styks' "full value" after the purchase than before.

Defendants respond that the sticker transactions are permissible because the profits from the sales would have been recognizable under GAAP. There is no dispute that the Purchase Agreement measures Jimmy Styks' gross profits using "generally accepted accounting principles . . . , as applied by [Vista]." Defendants, however, conflate GAAP with the distinct issue of whether the defendants acted in bad faith by arbitrarily and materially boosting Jimmy Styks' revenue. Cf. United States v. Rigas, 490 F.3d 208, 220 (2d Cir. 2007) (citing United States v. Simon, 425 F.2d 796, 805-06 (2d Cir. 1969)("It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case.")).[5] As defendants'

---

[5] To be sure, GAAP can be probative of whether a defendant acted in "good faith," i.e., without an intent to deceive, in certain types of securities fraud actions. See United States v. Ebbers, 458 F.3d 110, 125 (2d Cir. 2006); see also Rigas, 490 F.3d at 220. The claim that GAAP is probative here, however, is the

GAAP expert testified, whether a transaction is made in bad faith has no bearing on whether the revenue is recognizable under GAAP. See Fortney Decl. Ex. 176, Ashe Tr. at 253:24- 254:12, ECF No. 58. Conversely, compliance with GAAP does not preclude the possibility that a transaction is made in bad faith or otherwise contravenes the purpose of the earnout provision. Id. at 251:13-253:14. Indeed, if it were otherwise, defendants could have entered into transactions that were forbidden by Vista policy - or even illegal - but would still be entitled to their earnout if the transactions would have resulted in GAAP revenue. See id. at 168:17-170:14. No reasonable party would have agreed to such an outcome, and the covenant of good faith and fair dealing is implied by law precisely to prevent such maneuvers.

Defendants' reliance on Judge Koeltl's recent decision in Vysyaraju v. Mgmt. Health Sols., Inc., No. 12 CIV. 4420 JGK, 2013 WL 4437236 (S.D.N.Y. Aug. 19, 2013) is misplaced. In

---

equivalent of saying that a defendant who has engaged in a "pump and dump" scheme, a quintessential securities fraud, nonetheless acted in good faith because the purchases and sales were recognizable under GAAP. Similarly, the present case shows that a defendant can comply with GAAP but still intentionally deny its counterparty the benefits of the contract. Indeed, a plaintiff need not even show intentional deception to prove a breach of the implied covenant - the "arbitrary" or "irrational" exercise of contractually conferred discretion will suffice. See Sec. Plans, 769 F.3d at 810, 818.

Vysyaraju, the parties signed a purchase agreement containing an earnout provision and representations that the parties had prepared their pre-closing financial statements in accordance with GAAP, "consistent with past practice." Id. at *3. The agreement further stated that the parties would measure post-closing profits in accordance with GAAP, but did not require adherence to "past practice." Id. at *6. The plaintiff brought suit alleging bad faith after the defendant changed its accounting policies, but the court dismissed the claim, reasoning that the purchase agreement addressed GAAP pre- and post-closing, and "[w]here the parties wanted revenue calculated through procedures other than those provided by GAAP they knew how to do that." Id. at *8.

Here, unlike in Vysyaraju, the allegations concern the types of transactions that parties may enter under the Purchase Agreement – not the accounting method used to measure such transactions. Furthermore, while the Purchase Agreement in Section 3.7(c) specifies what types of transactions are permissible pre-closing, it is silent concerning post-closing transactions. The terms of the Purchase Agreement are therefore no bar to Vista's claim because the agreement leaves the issue to the parties' discretion, which is bounded by the covenant of

good faith and fair dealing – the subject of the present
dispute. See Sec. Plans, 769 F.3d at 818.[6]

Defendants make two additional points that, while correct,
are immaterial. Defendants argue that the Purchase Agreement
does not prohibit them from purchasing Jimmy Styks products.
Defendants and Counter-Plaintiffs' Memorandum of Law in Support
of their Motion for Summary Judgment ("Defs.' Br.") at 18, ECF
No. 51.[7] Defendants also add that the agreement allows Reeves and
Wilkens to start new product lines. Id. at 4. But there is no

---

[6] Defendants' reliance on Times Mirror Magazines, Inc. v. Field &
Stream Licenses Co., 294 F.3d 383, 393 (2d Cir. 2002) is
similarly misplaced. There, the plaintiff alleged that the
defendant breached the covenant of good faith and fair dealing
by entering into "sham" licensing agreements, generating little
or no revenue, to secure the right to use certain disputed
trademarks on certain types of products. Id. The relevant
agreement set forth specific procedures that the parties had to
follow in entering such licensing agreements, including that the
licensing party must "promptly provide" evidence of the "bona
fide nature" of the license upon demand of the non-licensing
party. Id. Because the plaintiff never made demand, the district
court found, and the Second Circuit affirmed, that the plaintiff
failed to test the defendant's "good faith through the
procedures set forth in the agreement," id., and that the
plaintiff could not avoid the agreement's express requirements
by turning to the duty of good faith and fair dealing. Id. at
394-395. The present dispute involves no such explicit
contractual requirements to "test" defendants' good faith.

[7] Defendants are also correct that Vista discloses in its
financial reports that it has engaged in related-party
transactions in the past. However, such sales are immaterial by
any relevant metric: $8,874 through February 9, 2015, and
$12,422 for the fiscal year ended March 31, 2014. See Pl.'s R.
56.1 Statement at ¶ 387; Carle Decl. Ex. NN (Vista 10-K).

13

evidence that this was what the defendants were about. On the
contrary, it is essentially undisputed that they were entering
into an artificial set of transactions solely so that they could
qualify for their earnout.

Based on the foregoing, there is no genuine dispute that
defendant Jeremy Wilkens, as a company insider who orchestrated
the sticker transaction, breached the implied covenant of good
faith and fair dealing. There is also no genuine dispute that
defendant Michelle Wilkens breached the covenant. While Mrs.
Wilkens was not an insider and did not submit purchase orders in
her own right,[8] she testified that Mr. Wilkens discussed the
sticker scheme with her and asked whether she was "okay with
it," and that she subsequently used her husband to make purchase
orders on her behalf for the purpose of "buying the earn-out."
See Fortney Decl. Ex. 16 at 138:10-139:10; see also id. ("Q. Did
there come a time in 2016 when you and your co-founders decided
to place a series of purchase orders with Vista . . . ? A. Yes.

───────────────────

[8] Vista argues that Mrs. Wilkens submitted an order for four
stickers in May 2016 in what Vista refers to as a "dry run" for
the $4 million purchase. However, there is a genuine dispute
whether Mrs. Wilkens purchased the stickers for that purpose,
because she testified that she made the order because she
thought the stickers were "cute." See Fortney Decl. Ex. 16 at
125:4-5. While this testimony seems dubious, its resolution
would require an assessment of credibility not amenable to
summary judgment.

Q. When did you decide to place that order? A. When Jeremy [Wilkens] decided to put the [purchase order] in.").[9] Mrs. Wilkens cannot now avoid liability simply because she used her husband to buy the stickers rather than purchasing them herself.[10]

On the other hand, Vista has not shown that the Reeves Family Trust acted in bad faith. It is undisputed that the trustee, Eleanor Reeves, considers and generally follows the advice of defendant Reeves in carrying out her duties. Pl.'s R. 56.1 Statement at ¶ 25. However, Ms. Reeves did not authorize the purchase orders made on behalf of the trust by her son and had no knowledge of the purchase orders at the time they were made. Id. at ¶¶ 253-255. Vista further blocked the orders before Ms. Reeves could ratify the transactions, and therefore has

---

[9] Mr. Wilkens corroborated Mrs. Wilkens' testimony. See Fortney Decl. Ex. 18 at 132:19:23 ("Q. You and Ms. Wilkens were prepared to pay . . . 1.724 million on Invoice Number 2; correct? A. Correct. Q. And you and Ms. Wilkens were ready, willing, and able to pay $172,416 for promotional stickers from Jimmy Styks per Invoice 4? A. Yes.").

[10] The Court is mindful that under New York law, there is no cause of action for aiding and abetting a breach of the covenant of good faith and fair dealing. Griffith-Fenton v. JPMorgan Chase/Chase Home Fin., No. 15 CV 4108 (VB), 2015 WL 10850340, at *5-6 (S.D.N.Y. Nov. 12, 2015). This is not an aiding and abetting claim, however, because Mrs. Wilkens was a signatory to the Purchase Agreement, was aware of the purpose of the sticker transaction, and used her husband as her agent to participate in the transaction.

failed to show that the Court should impute bad faith to the
<u>trust</u> based on the actions of defendant Reeves.[11]

For the foregoing reasons, the Court grants partial summary
judgment for Vista on Count IV holding that defendants Jeremy
Wilkens and Michelle Wilkens breached the covenant of good faith
and fair dealing, and on Count I declaring that the sticker
transactions were not an appropriate means for Jeremy Wilkens,
Michelle Wilkens, and the Reeves Family Trust to generate gross
profits for the purposes of the earnout. Conversely, the Court
grants summary judgment to the Reeves Family Trust dismissing
Count IV as to the Trust.

The Court next turns to whether defendant Reeves tortuously
interfered with the Purchase Agreement by procuring Mr. and Mrs.
Wilkens' breach of that Agreement (Count V).[12] Under New York

---

[11] This does not mean that Vista lacked a legitimate business
reason for blocking the transactions, given that defendant
Reeves had no authority to place the orders and that the
transactions also violated Vista's Code of Business Ethics, as
set forth in Court's discussion of Counterclaim III, <u>infra</u>.

[12] Although Vista did not initially move for summary judgment on
Count V, defendants moved for summary judgment in their favor on
Count V and Vista in its opposition to that cross-motion asked
the Court to grant summary judgment in Vista's favor on that
claim. The Court has authority to grant summary judgment <u>sua
sponte</u> where the moving party has notice and the court's
"determination is based on issues identical to those raised by
the moving party." <u>Bridgeway Corp. v. Citibank</u>, 201 F.3d 134,
140 (2d Cir. 2000) (internal citations and quotations omitted).
Here, the Court's grant is not even <u>sua sponte</u> (given Vista's
request), defendants do not raise a procedural objection, and

16

law, the elements of tortious interference with contract are (1)
"the existence of a valid contract between the plaintiff and a
third party"; (2) the "defendant's knowledge of the contract";
(3) the "defendant's intentional procurement of the third-
party's breach of the contract without justification"; (4)
"actual breach of the contract"; and (5) "damages resulting
therefrom." CAC Grp. Inc. v. Maxim Grp. LLC, 523 F. App'x 802,
806 (2d Cir. 2013). Furthermore, "[a] plaintiff must allege that
there would not have been a breach but for the activities of
defendant[]." Sharma v. Skaarup Ship Mmmt. Corp., 916 F.2d 820,
828 (2d Cir. 1990) (internal quotations omitted).

Defendants seek dismissal of the tortious interference
claim primarily because, in their view, there has been no breach
of the implied covenant of good faith and fair dealing. As set
forth above, this contention is without merit. Defendants'
remaining arguments are similarly unpersuasive. Defendants
argue, without elaboration, that Reeves is not a "but for" cause
of Jeremy and Michelle Wilkens' breach. It is undisputed,
however, that it was Reeves who sourced the stickers and made
them available for sale on Jimmy Styks' website. Defs.' Br. at

the Court's determination is based on issues identical to those
raised in defendants' cross motion. The Court therefore has firm
authority to grant summary judgment to Vista on Count V.

7-8. Without Reeves' involvement, the sticker scheme would never have taken place.

Defendants' additional argument, that Vista has not shown damages resulting from Mr. and Mrs. Wilkens' breach, is likewise unavailing. Vista seeks to recover the $60,500 spent by Reeves (and billed to Vista) to procure the stickers, which defendants oppose because Vista approved the payment. While it is true that Vista authorized the purchase orders, a party cannot ratify a transaction without having full knowledge of the material facts relating to it. Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2nd Cir. 1999) (quoting Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S 2d 429, 432 (1982)). Defendant Reeves, in turn, did not inform Vista at the time of its approval that the sole purchasers of the stickers would be the signatories to the Purchase Agreement, a fact material to Vista because of its effect on the earnout. Vista's approval therefore does not bar its recovery.

Based on the foregoing, the Court grants summary judgment for Vista on Count V, holding that defendant Reeves tortuously interfered with the Purchase Agreement by procuring Michelle and Jeremy Wilkens' breach.

The parties next seek summary judgment in their respective favors on Vista's Count VI, alleging breach of contract. Section

18

2.5 of the Purchase Agreement requires the parties to reconcile Jimmy Styks' estimated pre-closing balance sheet with its balance sheet at closing. Pl.'s R. 56.1 Statement at ¶¶ 46, 278-280. Pursuant to this arrangement, it is undisputed that defendants Reeves and Wilkens owed Vista $132,284 but only paid half of this amount. Id. at ¶¶ 286, 293.

Defendants argue that Vista is barred from collecting the remainder because it failed to give them proper written notice. Vista concedes that it did not send written notice to Jimmy Styks' physical address, as required by the Purchase Agreement, but did send notice directly to the defendants via email. Id. at ¶ 282. Since, however, defendants admit that they received the emails and do not claim any prejudice, Vista's failure to strictly abide by the notice provisions of the Purchase Agreement does not block its recovery. See Schweizer v. Sikorsky Aircraft Corp., 634 F. App'x 827, 829 (2d Cir. 2015) (quoting Fortune Limousine Serv., Inc. v. Nextel Commc'ns, 35 A.D.3d 350 (2006) ("Under New York law, 'strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation.'")). Defendants' additional arguments, alleging waiver and equitable estoppel, are without merit given Vista's efforts to collect.

For the foregoing reasons, the Court grants summary judgment for Vista on Count VI holding that defendants Reeves Family Trust, Jeremy Wilkens, and Michelle Wilkens breached Section 2.5 of the Purchase Agreement by failing to make payments necessary to reconcile Jimmy Styks' estimated pre-closing balance sheet with its balance sheet at closing.

Since, as noted, Vista previously dismissed Counts II and III voluntarily, the Court now turns to defendants' counterclaims. Counterclaim III alleges that Vista breached the covenant of good faith and fair dealing by blocking the sticker transactions. Defendants claim that Vista had a "strong financial incentive" to avoid hitting the earnout because of what they assert is the provision's "unusual" structure. Defendants and Counter-Plaintiffs' Opposition to Plaintiff Vista Outdoor Inc.'s Motion for Summary Judgment as to the Counterclaims and Counts IV and VI of the Complaint ("Defs.' Opp.") at 11-12, ECF No. 66. In particular, defendants claim that while earnout structures ordinarily "provide[] that both sides would receive proportionate shares of any earnings or margins above certain thresholds," the earnout here, by providing that the defendants "would be owed almost $4 in earn-out payments for every $1 in gross profit achieved beyond an

initial threshold," gave Vista an unusually strong incentive to evade the earnout. Id. at 11.

Initially, it should be noted that defendants' claim that this earnout structure is unusual is unsupported conjecture without meaningful empirical support.[13] By contrast, the record clearly shows that Vista had a financial incentive to help Jimmy Styks hit its targets. There is no material dispute that Vista's investors measure the company based on adjusted earnings, which do not include earnout payments. See Pl.'s 56.1 Statement at ¶¶ 100, 102, 104-105.[14] As a result, Vista's adjusted earnings only improve if Jimmy Styks exceeds its earnout targets. Id. at ¶

---

[13] Defendants' support consists of a single merger agreement, signed nearly 30 years ago, where the parties agreed that the earnout would be "calculated as $.50 for each $1 of earnings." See Keene Corp. v. Bogan, No. 88 Civ. 0217 (MBM), at *1 (S.D.N.Y. January 11, 1990). The other decision cited by defendants, Fireman v. News Am. Mktg. In-Store, Inc., 2009 WL 3080716 at *2 (D. Mass. September 26, 2009), lends no support as the decision states only that the earnout would be measured by "an amount equal to [certain specified percentages] of the Gross Margin of the Company."

[14] Defendants respond that Vista, as a public company, is required to report GAAP financial statements and that its earnings are "far stronger" on a GAAP basis if Jimmy Styks narrowly misses the earnout. Defendants' allegations that Vista's GAAP earnings would have been "far stronger" without the earnout is dubious given that Vista had over $2 billion in sales in 2016. But even assuming the earnout did have a material impact on GAAP, defendants cite no evidence that GAAP earnings are material to Vista's investors, Vista, or the employees alleged to have acted in bad faith.

106. Given that Vista also provides bonuses to executives based on adjusted earnings, id. at ¶ 107, Vista and its employees had no reason to block the sticker purchase in bad faith, id. at ¶ 108.[15]

But even aside from plaintiff's lack of motive, defendants' counterclaim fails for the more fundamental reason that Vista had a legitimate business rationale for blocking the sales, viz., that, as already established, defendants entered the transactions in bad faith to manipulate the earnout. See Sec. Plans, 769 F.3d at 820 (if a party has "a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant.").

Equally fundamentally, defendants do not genuinely dispute that the terminated transactions would have violated the company's Code of Business Ethics, which Vista invoked in its termination letters to defendants Reeves and Wilkens. See Fortney Decl. Ex. 7. Defendants do not claim that Vista's interpretation of its Code of Business Ethics is arbitrary or

---

[15] While defendants "dispute" the latter point in their Rule 56.1 response, they cite no evidence as required by Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)").

irrational, as required to show bad faith, but argue only that
Vista equivocates in its briefing on whether there was such a
violation. Defs.' Opp. at 17. This is not correct. Vista's
statement in its brief that the attempted purchase "almost
certainly violated internal Vista policies," Pl.'s Br. at 20,
cannot be fairly read as equivocal, given that plaintiff
elsewhere states that the attempted transaction if carried out
would "violate internal Vista policies," Pl.'s Opp. at 14;
Plaintiff and Counterclaim-Defendant Vista Outdoor Inc.'s Reply
Memorandum of Law in Further Support of its Motion for Summary
Judgment as to Counts IV and VI of the Complaint and Counts I-VI
of Defendants and Counterclaim Plaintiffs' Counterclaims ("Pl.'s
Reply") at 6, ECF No. 74. This slight difference in verbiage is
insufficient to create a suggestion that Vista has somehow
rescinded its claim that the attempted transactions clearly
violated its Code, when the undisputed facts show beyond any
genuine dispute that they did.[16]

    For the foregoing reasons, the Court grants summary
judgment for Vista dismissing Counterclaim III.

---

[16] Given that Vista has established several legitimate business
rationales for rejecting the sticker transaction, the Court does
not reach the issue of whether the revenue from the transactions
would in fact be recognizable under GAAP.

The Court similarly grants summary judgment for Vista dismissing Counterclaim II. Defendants allege that Vista intentionally mismanaged Jimmy Styks following the acquisition in order to avoid paying the earnout and therefore acted in bad faith. Courts in this Circuit have consistently found, however, "that acquisition agreements containing earn-out provisions are not violated by a defendant's alleged mismanagement where the plaintiff has failed to produce evidence of bad faith." Wagner v. JP Morgan Chase Bank, 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011). While Vista's integration of Jimmy Styks into its corporate structure may not have been "consistent with best practice," see Carle Decl. Ex. B at 7-23, this is insufficient to establish bad faith in the absence of any evidence of irrational or arbitrary conduct.

Defendants "illustrative example" concerning a proposal by defendant Reeves to sell SUPs through Amazon.com is unconvincing. The record shows that Vista rejected Reeves' request because its personnel at the time were seeking to build business with other retailers. See Fortney Decl. Ex. 69 at VISTA_000087318. Vista later reevaluated the decision to sell on Amazon and changed course in July 2016. Pl.'s R. 56.1 Statement ¶¶ 189, 192; Plaintiff and Counterclaim-Defendant Vista Outdoor Inc.'s Response to Defendants' Statement of Additional Facts

24

Pursuant to Local Civil Rule 56.1(b) ("Pl.'s Reply R. 56.1
Statement") ¶¶ 380-381, ECF No. 78. There is nothing even
arguably irrational or arbitrary about these business decisions,
and the Court accordingly grants summary judgment for Vista
dismissing Counterclaim II.

The Court further grants summary judgment for Vista
dismissing defendants' penultimate set of counterclaims,
alleging that Vista retaliated against defendants Reeves and
Wilkens in violation of state and federal whistleblower
protections (Counterclaims IV-VI). "The elements of a
retaliation claim under the Dodd-Frank Act are (1) that the
plaintiff engaged in a protected activity, (2) that the
plaintiff suffered an adverse employment action, and (3) that
the adverse action was causally connected to the protected
activity." Ott v. Fred Alger Mgmt., Inc., No. 11 CIV. 4418 LAP,
2012 WL 4767200, at *4 (S.D.N.Y. Sept. 27, 2012). The standard
for defendants' state law claim is the same.[17]

---

[17] Defendants state that the California Labor Code, applicable to
the defendants' state law claims, applies where an "employee has
reasonable cause to believe that the information discloses a
violation of state or federal statute, or a violation of or
noncompliance with a local, state, or federal rule or
regulation." The parties otherwise draw no distinction between
the state and federal claims.

Assuming, arguendo, that defendants have engaged in some minimal protected activity,[18] they still have failed to show a causal connection between their complaints and their termination. Defendants cite no direct evidence and instead argue only that Vista personnel displayed "hostility and resentment" after defendants made their reports and that Vista terminated defendants Reeves and Wilkens' employment shortly after their making complaints.

Defendants' allegations of "hostility" and "resentment" are without genuine factual foundation. Defendants rely on two text messages circulated among Vista personnel whose positions

---

[18] To the extent that any protected activity exists here, it is, indeed, minimal. In assessing the reasonableness of an employee's belief, "courts look to the bases of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 444 (S.D.N.Y. 2013). The statute "require[s] plausible allegations that the whistleblower reported information based on a reasonable belief that the employer violated one of the enumerated provisions set out in the statute." Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 222 (2d Cir. 2014) (citing 18 U.S.C. § 1514A(a)(1)). Here, defendants admit that they were unfamiliar with Vista's internal controls and that the effectiveness of these controls was the sole basis for their alleged "protected activity." See Fortney Decl. Ex. 17 at 288:16-289:1 (K. Reeves Tr.); Ex. 18 164:10-16 (J. Wilkens Tr.); Defs.' Opp. at 20. Defendants' lack of familiarity is further evident on the face of their "complaints," which largely consist of throwing the term "SOX" in emails, with little or no explanation, in order to gain leverage for a particular grievance. See, e.g., Reeves Decl. CCC.

defendants largely omit to identify. See Carle Decl. Exs. U, Y.
The messages, in turn, consist of single lines of text with no
context or background and showing no causal link between
defendants' complaints and any alleged animosity.[19] Defendants'
additional evidence, an email chain among defendant Reeves and
several Vista employees, likewise exhibits no hostility. In the
chain, defendant Reeves asks for information concerning Jimmy
Styks' financials, which Vista personnel promptly answer. One of
the Vista recipients then follows up with another Vista employee
to gather more information because "our friends in Cali focus on
these things and don't do much else if we could get these
answers today it would be helpful so can call him and discuss."
Id. at Ex. AA. Vista's conduct shows that it was attentive and
responsive rather than "hostile" and "resentful."

        Moreover, the timing of Reeves and Wilkens' termination
fails to establish a causal link. While the Second Circuit has
declined to "draw[] a bright line to define the outer limits
beyond which a temporal relationship is too attenuated to

---

[19] The first text message is from an unknown Vista employee, Mark
Kowalski, to another unspecified Vista employee, Andy Keegan,
stating "well I guess 20m doesn't make you responsible. Money
can't fix crazy." Carle Decl. Ex. U. The second text message is
from Vista's Director of Operations for Outdoor Products, Ken
Sosko, to an unspecified employee, Nicole Murphy, stating that
"Or maybe could just tie Kyle to the ground and let them shit
all over him." Id. at Ex. Y.

establish a causal relationship between the exercise of a
federal constitutional right and an allegedly retaliatory
action," Leshinsky, 942 F. Supp. 2d at 450 (quoting Gorman-Bakos
v. Cornell Co-op. Extension of Schenectady Cnty., 252 F.3d 545,
554 (2d Cir. 2001)), where a plaintiff relies solely on temporal
proximity to prove causation, the protected activity and the
plaintiff's termination must be "very close." Id. (quoting Clark
Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).
Accordingly, "district courts in this Circuit have consistently
held that a passage of more than two months between the
protected activity and the adverse employment action does not
allow for an inference of causation." Fraser v. Fiduciary Trust
Co. Int'l, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009)
(citation and internal quotation marks omitted), aff'd, 396 F.
App'x 734 (2d Cir. 2010).

Defendants have failed to show a sufficiently "close"
passage of time. Defendants' last "complaint" was in March 2016,
when defendant Reeves emailed Vista employees that he was "[n]ot
sure how accurate financials are possible when every week we
double pay factories." Pl.'s R. 56.1 Statement at ¶ 338. This
was roughly two months before Vista began plans to terminate

Reeves,[20] and three months prior to defendants' actual termination.[21] Given defendants' failure to proffer any corroborating evidence that they were terminated because of their complaints, this passage of time is too long to establish a causal relationship.

For the foregoing reasons, the Court grants summary judgment for Vista dismissing Counterclaims IV-VI.

The Court lastly turns to defendant's Counterclaim I, which alleges that Vista failed to comply with certain procedural

---

[20] It is undisputed that approximately four weeks before defendants attempted their sticker purchase, Vista began plans to terminate defendant Reeves after he circulated a profanity-laden email to numerous Vista employees. Pl.'s R. 56.1 Statement at ¶¶ 346-351. It is also undisputed that Vista intended to have defendant Wilkens remain at the company after Reeves' departure. Id. at ¶ 352. The fact that Vista initiated termination proceedings only against Reeves, despite the fact that both Reeves and Wilkens made complaints, further shows that there is no causal connection between defendants' termination and their alleged protected activity.

[21] Moreover, even if defendants could show temporal proximity, the undisputed facts show that there was a legitimate intervening basis for defendants' termination. See Sharkey v. JPMorgan Chase & Co., No. 15-3400-CV, 2016 WL 4820997, at *1 (2d Cir. Sept. 12, 2016) (holding open as a matter of law whether a legitimate intervening basis can defeat an inference of causation based on temporal proximity). There is no genuine reason to dispute that the sticker purchase was made in bad faith and it is undisputed that Vista's termination letter to defendants Reeves and Wilkens cited the sticker purchase as the reason for their termination. While defendants fault Vista for "provid[ing] no declaration from any employee or other evidence, beyond the termination letter itself," it is not Vista's burden to do so given that defendants have failed to raise a genuine dispute on this issue.

requirements under Section 2.6(d)(ii) of the Purchase Agreement. The provision requires Vista to submit to defendants a "Gross Profit Statement" setting forth in reasonable detail Vista's calculation of Jimmy Styks' gross profit for the first earnout period, and also requires Vista to consult with defendants in advance of determining Gross Profit.

Vista complied with the terms of the provision. Vista revised its Gross Profit Statement in response to defendants' concerns, and defendants fail to cite a single objectionable item on the revised statement. The revised statement further gives defendants the gross profit information for the 12 months surrounding the year-one earnout – the subject of the instant litigation – and is in compliance with the Purchase Agreement's specifications. Pl.'s R. 56.1 Statement at ¶¶ 51, 307. The Court accordingly grants summary judgment for Vista dismissing Counterclaim I.

In sum, the Court grants summary judgment for Vista on Counts I, V, and VI, and on Count IV insofar as it applies to defendants Jeremy Wilkens and Michelle Wilkens; dismisses the remaining claims; and grants summary judgment for Vista dismissing all of defendants' counterclaims. It follows, inter alia, that defendants Kyle Reeves, Jeremy Wilkens, and Michelle Wilkens are jointly and severally liable to Vista for the cost

30

of sourcing the stickers in the amount of $60,500, and that

defendants Reeves Family Trust, Jeremy Wilkens, and Michelle

Wilkens are jointly and severally liable to Vista for their

failure to pay the Purchase Price Adjustment under Section 2.5

of the Purchase Agreement in the amount of $66,142.

The parties are directed to submit to the Court by February

17, 2017 respective three-page single-spaced letters giving

their competing calculations of the prejudgment interest, if

any, to be added to the foregoing amounts so that final judgment

can be entered. The Clerk of Court is hereby ordered to close

the docket at numbers 36 and 50.

SO ORDERED.

Dated:    New York, NY
          February 13, 2017          JED S. RAKOFF, U.S.D.J.

31